UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| GREGORY RUTLEDGE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:21-CV-46-SNLJ |
| | ) |
| SUNBELT RENTALS, INC. | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This is a personal injury action between plaintiff Gregory Rutledge and defendant Sunbelt Rentals, Inc. Plaintiff claims that he was injured by an electrical shock while using a power saw rented from defendant. *See generally,* [Doc. 3.] Defendant moves for summary judgment. [Doc. 52.] For the reasons stated below, the Court denies defendant's motion.

I.   **Facts**

The facts are construed in the light most favorable to plaintiff, the non-moving party. Plaintiff is a general contractor who was regularly employed to perform renovation work by Third-party defendant Matthew Butler ("Butler").[1] [Doc. 68 at ¶ 1.] On April 2, 2019,

---

[1] Defendant Sunbelt Rentals filed a third party complaint for indemnity against Butler [Doc. 10] and moved for summary judgment on its claims against him. [Doc. 37.] Because Defendant Butler filed notice of Bankruptcy [Doc. 45], the Court is unable to resolve that pending motion.

plaintiff arrived to perform such renovation work for Butler at a residence in Cape Girardeau, Missouri.  *Id.* at ¶ 2.  Butler wanted plaintiff to cut concrete in the basement. For that purpose, Buter had rented a Husqvarna Model K 4000 Electric Cut & Break Saw ("the Saw") from defendant, and he provided plaintiff with that saw to cut concrete.  *Id.* at ¶ 3.  Butler never asked defendant for a copy of the Saw's owner's manual, nor did defendant provide one to him.  [Doc. 70-1 at 11] (dep. p. 44).

The Saw's power cord came equipped with a ground fault circuit interrupter (GFCI). [Doc. 68 at ¶ 13.] The GFCI is a safety device that automatically shuts off the tool when tripped, which is when the device detects a ground fault current of 6mA or higher downstream of the GFCI device.  [Doc. 53-7 at 7.]  Plaintiff has extensive experience with using power tools, including wet saws, tile saws, circular saws, among others.  [Doc. 66 at ¶ 2.]  In fact, plaintiff testifies that he has used a concrete wet saw, like the Saw in question, "hundreds" of times.  *Id.* at ¶ 4.  In all those times plaintiff used power tools, he had never been electrocuted by one.  *Id.* at ¶ 5.

When plaintiff arrived at the job site, he found the Saw hooked up to a water hose. While in operation, the Saw sprays water to keep the spinning blade cool.  The spraying water and spinning blades creates a watery, concrete mix which can spread water around the work environment.  [Doc. 53-3 at 7, 8, 21.]  The Saw's power cord was already plugged into an extension cord.  [Doc. 68 at ¶¶ 18–19.]  Without inspecting the Saw, reading any warning labels, or reading any owner's manual, plaintiff plugged the extension cord into a wall electric socket.  *Id.* at ¶¶ 8–14, 19.  He made sure that the junction between the Saw's

2

power cord and the extension cord was elevated and off the ground so that the junction would not get wet. Butler's testimony corroborates this, saying that he instructed plaintiff to keep the power cord and extension cord off the floor and that plaintiff would "know better," then to leave it exposed to water [70-1 at 22] (dep. p. 86).[2]

Plaintiff got to work on cutting the concrete. Within 10 to 15 minutes of using the Saw, the circuit breaker in the house tripped and cut off power to the Saw. [Doc. 68 at ¶ 23.] Plaintiff's co-worker reset the circuit breaker, and plaintiff went back to using the Saw without changing the configuration of the Saw, power cord, extension cord, or receptacle. While cutting, the Saw's power cord trailed behind plaintiff, exposing it to some of the watery concrete run-off. [Doc. 70-2 at 19] (dep. pp. 75–76). Plaintiff normally operated wet saws this way because he knew the power cords are rated safe to use in wet conditions. *Id.* Being ambidextrous, Plaintiff would swap which hand he used to hold the saw's trigger to keep it running, occasionally using the free hand to adjust the trailing power cord. *Id.* at 20 (dep. p. 77). During one such cord adjustment, plaintiff noticed something off about a section of the Saw's power cord for the first time. He testifies that:

---

[2] Multiple times, defendant pulls an out-of-context portion of Butler's testimony to suggest that plaintiff, at all times while he was using the saw, had the junction on the floor and exposed to water. *E.g.*, [Doc. 66 at ¶ 9.] Butler was asked "was any part of the saw's power cord or the extension cord on the ground of the basement?" to which he answered, "from what I recall *at the end of it*, it all was. It probably yanked it *when he got shocked*. As you can imagine, you don't have a lot of control." [Doc. 66-1 at 3](emphasis added). The most this testimony establishes is that, by the time Butler arrived on the scene *after* plaintiff was electrocuted, the entirety of the extension cord was on the ground. Thus, plaintiff's testimony that he placed the junction above ground *before* the shock is uncontroverted.

3

> I had to pull the cord up to get it out from under my legs a little bit to readjust when I noticed the cord was unraveling.  I was going to put the saw down.  I had it running cutting in the groove when I adjusted the cord and seen the electrical tape starting to fray off, and that's when I went to let go of the trigger going, "Oh, this ain't good," not knowing it was there ever at all.  As soon as I let go of the trigger, that's when everything went bad. It shocked my hand, made me regrip the trigger, and down I went.

*Id.* Though it is not entirely clear which hand plaintiff had on the saw and which hand he was using to adjust the power cord, according to plaintiff, electricity coursed through his left hand, up his left arm, and into his entire body, making him lose consciousness. *Id.* (dep. p. 77–79).  Eventually, the home's circuit breaker tripped again, shutting off power to the Saw and also to plaintiff. *Id.* at 20–21 (dep. pp. 80–81).  When plaintiff came to, he was badly injured, eventually losing consciousness again and waking up in the emergency room. *Id.* at 21 (dep. p. 83).

Sometime later, plaintiff filed this lawsuit against defendant.  He alleges that the Saw's power cord had been cut, then spliced back together and wrapped in electric tape the same color as the rest of the Saw's power cord, as seen below. [3]

---

[3] Defendant's Exhibit G [Doc. 53-7 at 21, 27–28].  The first three photos show the Spliced Cord without the electrical tape, the photos are 19-180-266.jpg, 19-180-267.jpg, 19-180-268.jpg, respectively.  The next three photos show a closer look at the butt joints, with additional electric tape removed, and these are photos 19-180-283.jpg, 19-180-284.jpg, 19-180-285.jpg, respectively.  The final photo allegedly shows the Spliced Cord as plaintiff encountered it, before the experts removed the tapew.  This is a cropped version of 19-180-157.jpg.

4



Plaintiff maintains that regardless of who damaged or repaired the power cord—defendant or somebody else—defendant was the one who rented the Saw's power cord ("the Spliced Cord") out in that condition.

Plaintiff's retained expert witness, Jack Nevins, testified that the Spliced Cord was insufficiently repaired, which compromised the Cord's rating for use at wet locations. [Doc. 70-3 at 25](dep. p. 90).  Defendant's retained expert likewise submitted a report on

5

the electric saw and potential sources of plaintiff's electrical shock, and confirmed the damaged nature of the Spliced Cord. [Doc. 53-7 at 7.]

## II.   Legal Standard on Summary Judgment

Under Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing that there is a genuine dispute of a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Herring v. Can. Life Assur. Co.,* 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Anderson,* 477 U.S. at 248).

A party resisting summary judgment has the burden to designate the specific facts that create a triable controversy. *See Crossley v. Ga.–Pac. Corp.,* 355 F.3d 1112, 1114 (8th Cir. 2004). Self-serving, conclusory statements without support are not sufficient to defeat summary judgment. *Armour and Co., Inc. v. Inver Grove Heights,* 2 F.3d 276, 279 (8th Cir. 1993). The "mere existence of a scintilla of evidence in support of the plaintiff's

6

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005) (internal citation omitted)

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

### III. Discussion

#### A. Plaintiff's Motion to Strike Defendant's Exhibit G.

The Court deals with plaintiff's motion to strike defendant's Exhibit G as a preliminary matter. Exhibit G [Doc. 53-7] is an engineering analysis conducted by defendant's expert, John Reagan, P.E. Plaintiff's sole argument for striking this report is that "Exhibit G is not sworn to or attested to and is inadmissible hearsay that lacks foundation." Plaintiff cites to no law or Federal Rule for the basis of exclusion. Nor does plaintiff make any reply to defendant's response that Exhibit G should be admitted. [Doc. 65]

Federal Rule of Civil Procedure 56(c)(1)(A) states that in support of summary judgment, a party may cite to materials in the record, including depositions, documents,

7

affidavits or declarations, or other materials. Exhibit G is a signed declaration of defendant's expert, and so falls within the scope of Rule 56. To be considered on summary judgment, documents "must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements." *Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005) (cleaned up). As to authentication, Federal Rule of Evidence 901(a) provides that authentication requires the proponent to produce evidence "sufficient to support a finding that the item is what the proponent claims it is." *See also Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1045 (8th Cir. 2010) (providing standard). The proponent need only provide a rational basis that the document is what the proponent claims it to be. *Id.*

Here, Reagan signed and authenticated Exhibit G, though it was not sworn to at the time defendant submitted it. [Doc. 53-7 at 11.] District courts have discretion on whether to accept an expert's affidavit to cure previously unsworn materials. *DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 826 (8th Cir. 2009). Defendant has since provided Reagan's sworn affidavit wherein he reaffirms his testimony in Exhibit G. [Doc. 65-2.] Regardless of whatever insufficiencies may have existed at the time defendant filed Exhibit G, the Court will allow defendant to supplement the summary judgment record with Reagan's sworn affidavit, thereby curing the defects. *See DG&G, Inc.*, 576 F.3d at 826. Plaintiff makes no argument otherwise. Accordingly, plaintiff's motion to strike will be denied and the Court will consider Exhibit G as part of the summary judgment record.

B.  Defendant's Motion for Summary Judgment

Because the Court has jurisdiction based on the parties' diversity of citizenship, Missouri substantive law applies.  The parties agree that plaintiff's cause of action is a negligence claim and not a claim for strict liability.  To prevail under a negligence theory, plaintiff must plead and prove that (1) that defendant owed plaintiff a duty of care; (2) defendant breached that duty; (3) defendant's breach directly and proximately caused plaintiff's injury.  *Johnson v. Auto Handling Corp.*, 523 S.W.3d 452, 460 (Mo. banc 2017), as modified (Aug. 22, 2017).

Defendant's motion is "narrowly focused as to whether Plaintiff has proffered sufficient expert testimony to support his theory of liability against Sunbelt."  [Doc. 67 at 1.]  Given defendant's narrow framing of the issues, the Court will only look to its two arguments: first, whether plaintiff needed to proffer expert testimony that the saw's power cord caused plaintiff's electrical shock and whether without such testimony he has any proof of causation.  Second, whether plaintiff presented evidence for a jury could find that defendant breached a duty to plaintiff in providing a defective saw.  *Id.*  In its filings, defendant raises facts suggesting plaintiff shares comparative fault for his own injury.  *E.g.*, [Doc. 68 at ¶¶ 8–16.]  Though relevant to defendant's overall share of liability, these facts are not relevant to defendant's narrow argument on summary judgment, so they are not discussed.

9

Plaintiff's Expert Testimony

Both parties analogize to and rely on cases dealing with products liability and what plaintiff must show to survive summary judgment. Defendant suggests that Missouri law requires, in all cases, plaintiffs to provide expert testimony on causation of injury. In this case, that would mean plaintiff must provide some expert testimony that the Saw or its broken power cord actually caused his electrical shock. [Doc. 54 at 3.] Defendant hides the ball on Missouri law. Expert testimony is not necessarily required in products liability cases, but is only necessary when the lay jury does not "possess the experience or knowledge of the subject matter sufficient to enable them to reach an intelligent opinion without help." *Pro Serv. Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1214 (8th Cir. 2006). Plaintiff's expert Jack Nevins, who defendant does not contest is qualified to give an opinion, testified that the saw's power cord had been modified from its original manufactured design, rendering it unsafe. [Doc. 53-6 at 4–5.] As Mr. Nevins testified:

> The exterior jacket of the unified power cable had been cut and the internal conducts or three internal copper stranded conductors had been cut and they had been spliced using mechanical butt connectors. These are mechanically applied crimp connector and then subsequently electrical tape was wrapped around hose three spliced connectors.

*Id.* at 6. Defendant's own expert echoed this analysis. [Doc. 53-7 at 8.]

The result of this repair, said Nevins, "essentially violat[ed] the rating of the cord to be used in a wet location and in that condition, it could present a risk for electric shock." [Doc. 53-6 at 19.] Considering how the Saw has to be used with a constant flow of water, the Spliced Cord rendered the Saw unsafe. Therefore, contrary to defendant's arguments,

10

plaintiff provided expert testimony that the Saw was defective, with Nevins sharing that "the tool . . . the electric power cord specifically, presented a danger and possible exposure to an electric shock." [Doc. 53-6 at 22.]

Defendant's cited cases are inapposite because they concern instances when plaintiffs provided zero admissible expert testimony on the existence of a product defect. *E.g.*, *Miravelle v. One World Techs., Inc.*, No. 4:18-CV-304-JMB, 2021 WL 5801860 (E.D. Mo. Dec. 7, 2021) (granting summary judgment after excluding plaintiff's only expert testimony as unreliable, thereby leaving plaintiff without any evidence of a product defect); *McMahon v. Robert Bosch Tool Corp.*, No. 4:18-CV-583- SRC, 2019 WL 5727340 (E.D. Mo. Nov. 5, 2019), *aff'd*, 5 F.4th 900 (8th Cir. 2021) (same). Unlike in those cases, defendant does not challenge the admissibility of plaintiff's expert testimony. Thus, a jury could rely on Nevins's testimony to decide that the saw's power cord was defective in that it posed a risk of electrocution.

Causation of Injury

Defendant's follow-up argument is that plaintiff failed to prove causation because no expert definitively said that the Spliced Cord caused the electrical shock. Missouri law does not, in every circumstance, require expert testimony on either the existence of a product defect or on causation. *Pro Serv. Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210. 1214 (8th Cir. 2006). Sometimes, common experience establishes that some accidents "do not ordinarily occur in the absence of a defect and in those situations the inference that

11

a product is defective is permissible." *Williams v. Deere & Co.*, 598 S.W.2d 609, 612 (Mo. App. S.D. 1980).

Nevertheless, "[p]roof that a plaintiff's damages were caused by a defect in the product is an essential element of a plaintiff's case under a product liability theory." *Hills v. Ozark Border Elec. Co-op.*, 710 S.W.2d 338, 349 (Mo. App. S.D. 1986). "[E]xpert evidence that damage 'could' have been caused by certain things is not sufficient to establish causation by itself, but can be considered together *with other evidence* to determine if the evidence is sufficient to make a submissible question for the trier of fact." *Id.* at 341 (citing *Ketcham v. Thomas*, 283 S.W.2d 642, 649 (Mo.1955)) (emphasis added). Direct proof of causation is not required so long as the proved facts and circumstances, in the light of ordinary experience, "fairly suggest" negligence as the proximate cause. *Morris v. Israel Bros.*, 510 S.W.2d 437, 443 (Mo. 1974).

Though plaintiff need not exclude every potential cause where defendant would *not* be liable, *Id.*, "[t]he fact that circumstantial evidence is consistent with the theory of causation advanced by plaintiffs is not enough." *Hills*, 710 S.W.2d at 342 (citing *Kinealy v. Sw. Bell Tel. Co.*, 368 S.W.2d 400 (Mo. 1963)). When the evidence does not exclude other causes of an injury and when no layperson could have a reasonable basis as to the cause of that injury, an expert's opinion that a certain condition poses a risk is "not more than an assurance that such a result is scientifically possible" and does not alone establish substantial evidence that such condition caused the injury. *Kinealy v. Sw. Bell Tel. Co.*, 368 S.W.2d 400, 404 (Mo. 1963).

To be sure, plaintiff's expert provided no opinion on causation, testifying that he cannot determine the source of plaintiff's shock:

> **Q:** Do you know from what source, if any, Mr. Rutledge received his shock?
> **A:** I can't answer that with specificity, no.
> **Q:** Did you create a list of the potential areas where he could have sustained a shock?
> **A:** No, I did not.

[Doc. 53-6 at 12.]  And later

> **Q:** Did you reach the conclusion that, in fact, the Husqvarna power cord was the source of Mr. Rutledge's shock?
> **A:** No.

*Id.* at 22.  Nor could defendant's expert Reagan determine the source of the electrical shock. *See generally* [Doc. 53-7.]

Without any expert testimony on causation, the Court must look to the surrounding circumstances to see if laypersons could conclude that the defective power cord caused plaintiff's injury.  *See Hills*, 710 S.W.2d at 341   "The proof must be realistically tailored to the circumstances and the existence of a defect may be inferred from circumstantial evidence with or without the aid of expert evidence." *Id.*

Reagan's report (Exhibit G) gives additional information that is helpful in determining other likely sources of electrical shock.  Regan considered multiple sources of electrical current that could cause an electrical shock, including the saw, the connection between the saw power cord and the extension cord, the extension cord itself, and other unidentified conditions at the worksite.  [Doc. 53-7 at 10.]  Of these, the saw itself was the least likely source of the shock.  *Id.*  Reagan noted no deficiency in the extension cord

13

alleged to be the one in use the day of the accident. *Id.* at 9. Defendant does not raise any chain of custody issues or argue that the tested extension cord is anything other than the extension cord used during the time of plaintiff's injury. Finally, Reagan tested the Spliced Cord while it was partially submerged in water. "With the splice wet and partially submerged in water, the tool continued to function. The voltage in the container of water was tested to determine if the voltage present in the cord was contacting the water. The voltage measured in the water was 0.8 volts." *Id.* at 8. This test indicates that the spliced portion emitted voltage into the water.[4]

The way plaintiff describes the circumstances of his injury, the Saw cord was plugged into an extension cord that he then plugged into an electrical outlet on a wall. The junction between the saw cord and the extension cord was hanging above the ground, so it would not have gotten wet from water on the ground. [Doc. 61-1 at 18.] The power cord trailed behind plaintiff as he used the Saw, and the cord got wet because of the water shooting off the spinning Saw. *Id.* at 19–20. Plaintiff did not worry about water getting near the Saw's power cord because he knew that on a functioning saw, the power cord is rated to get wet. *Id.* at 19.

At some point while using the saw, one of plaintiff's hands—though it is not entirely clear which hand—trailed to the spliced part of the Cord wrapped in electrical tape. [Doc.

---

[4] Later in his report, Mr. Reagan said that "testing by partially submerging the power cord splice in water revealed that the voltage present in the cord was not making contact with the water surrounding the cord." [Doc. 53-7 at 9.] No explanation is given for this discrepancy between this test and the other test wherein he detected 0.8 volts in the water. Given this discrepancy, this fact is resolved in the light most favorable to plaintiff's case that there was transmission of voltage between the power cord and the water.

14

70-2 at 20](dep. p. 77). Plaintiff's testimony is that while using the saw, he "noticed the electrical tape on the cord and then [he] let it go" thinking that there might be a danger of being shocked. *Id.* (dep. p. 78). Before he could release the Saw, electricity traveled up his left to his left arm and then to his whole body. *Id.* (dep. pp. 78–79). If it were plaintiff's left hand that touched the spliced section, this would be consistent with Reagan's report that plaintiff's left hand was in contact with the voltage source, as well as Reagan's other testimony that indicated voltage could escape from the Spliced Cord. *See* [Doc. 53-7 at 7–8.] No matter which hand made contact, plaintiff testifies that he was touching the spliced section of the Cord when he got shocked. A jury could determine, consistent with plaintiff's testimony, that the Spliced Cord caused plaintiff's electrical shock.

The facts of this case are distinguishable from defendant's cited case, *Pro Service Automotive, L.L.C.*, 469 F.3d 1210 (8th Cir. 2006). In that case, the Eighth Circuit affirmed the exclusion of plaintiff's expert testimony under federal Rule of Evidence 702 in light of *Daubert*, deciding that the expert failed to give reliable opinion evidence on causation, which was necessary in that case because of the highly technical nature of the alleged product defect. Because the court determined that "expert testimony was necessary to prove causation *in this case* and that the expert testimony. . . properly was excluded by the district court," *Id.* at 1216 (emphasis added), the court affirmed summary judgment. *Id.* at 1216 (citing *Hills v. Ozark Border Elec. Co-op.*, 710 S.W.2d 338 (Mo. Ct. App. 1986)).

Based on the facts in the record and surrounding circumstances, this is not a case that requires expert testimony to establish causation. First, unlike the expert in *Pro Service*

15

*Automotive*, plaintiff provides admissible expert testimony that the Saw's power cord was defective and posed a risk of electrocution in wet working environments. Next, one of plaintiff's hands touched the electric tape of the Spliced Cord, putting him in direct contact with a voltage source. *See* [Doc. 70-2 at 20] (dep. p. 77). Finally, defendant's expert makes other sources of electrical shock unlikely, including a shock from the extension cord or from the Saw itself. As plaintiff points out, [Doc. 62 at 8] the GFCI protector on the Saw's power cord was located between the spliced section of the power cord and the junction between the power cord and the extension cord, as seen below. [Doc. 62 at 8.]



[Doc. 53-7 at 21] (19-180-154.jpg, annotations added). Because Reagan found the GFCI device to function properly, it presumably would have cut off the flow of electricity were

16

there any power surge coming from *below* it—that is, from the extension cord or the power outlet in which the extension cord was plugged. This is consistent with plaintiff's theory that the electrical shock came from the Spliced Cord and makes plaintiff's theory appear more likely than other alternative causes of electric shock.

The case of *Hills v. Ozark Border Electric Cooperative*, which the Eighth Circuit relied on in *Pro Service Automotive*, also helps plaintiff's case. In that case, plaintiffs sued their electric company, arguing that their building caught fire because "excessive voltage entered the body shop when the ground wire on the [defendant's] transformer disconnected because of its improper attachment to the primary neutral line. . . ." 710 S.W.2d at 342. According to the plaintiff's expert, this excessive voltage then could have diverted to a ground connected to the electrical panel of plaintiffs' building, and that this electrified conduct could "could possibly become hot enough to start a fire." *Id.* at 341.

The Missouri Court of Appeals concluded that the expert's theory on causation was too speculative to send to a jury. Fatal to plaintiffs' claim was the fact they "made no attempt to present evidence that might have eliminated other conditions that could have caused the fire . . ."; the fact that plaintiff's expert only testified that a damaged neutral line *could possibly* start fire, not that it did; and the fact that the complained-of condition of the neutral line was not observed until several hours later. *Id.* at 341–42. All-in-all, "[a] fire, in some manner due to electricity, is simply not that unusual." *Id.* at 342. The court concluded "[w]hether the claimed defect existed at the time the fire started, and, even if it

17

did, whether this defect caused the particular fire, are matters left to speculation and conjecture by the favorable evidence." *Id.*

The expert testimony proffered in *Hills* is analogous to plaintiff's own expert testimony. There, the expert only identified an electric defect that *could* cause damage, not that the defect actually caused the damage. Here, plaintiff's expert could not offer any definitive evidence on causation. But plaintiff's case is stronger than *Hills*, which justifies sending it to a jury. First, it is undisputed that the complained-of condition—the Spliced Cord—existed at the time of plaintiff's injury, meaning that it is a potential cause of plaintiff's injury. Second, other sources of electrical shock are less likely and could reasonably be ruled out by a jury, such as a defect in the saw itself or in the extension cord. Third, the circumstances of plaintiff's injury as he describes them—such as his hand coming into contact with the splice in the Cord and the Cord's transmitting voltage when partially submerged in water—could allow a layperson jury to conclude that the Spliced Cord was the source of the electrical shock. Fourth and finally, there is plaintiff's testimony that he has used saws like this in the past, in similar conditions, and without getting electrocuted. The only difference in this case and plaintiff's prior saw uses was the presence of a spliced power cord.

Laypeople, relying on their everyday knowledge, could reasonably conclude, just as plaintiff did, that "water and electricity don't mix," [Doc. 70-2 at 19] (dep. p. 76). From there, a jury could conclude that the Spliced Cord is the likeliest source of the electrical shock and that the shock would not have happened but-for the splice.

18

Breach of Duty

Finally, defendant argues that plaintiff cannot prove defendant breached any duty because plaintiff lacks expert testimony on that point. First, it is beyond dispute that defendant owed plaintiff a duty to furnish safe equipment. "Missouri does recognize a duty of a lessor [defendant] to exercise reasonable care to provide an instrumentality [the Saw] to a lessee employer [Butler] which is reasonably safe for the intended use [cutting concrete in wet conditions] by the lessee's employee [plaintiff]." *Parra v. Bldg. Erection Servs.*, 982 S.W.2d 278, 283 (Mo. App. W.D. 1998) (citing *Polovich v. Sayers*, 412 S.W.2d 436, 439 (Mo.1967)). "[I]n the case of a leased instrumentality, the lessor does have a duty to an employee of the lessee-employer to exercise ordinary care to determine whether it was safe at the time of its delivery to the employer or thereafter, depending on the circumstances, and if not, to either repair it or warn of the danger." *Id.* Much like the issue of causation, the "general rule is that expert testimony is *not* necessary to establish the element of a breach of duty, *unless* the subject in question is not within the knowledge or experience of lay people." *Id.* at 285 (citing cases) (emphasis added).

Construing the facts in the light most favorable to plaintiff, defendant breached its duty to plaintiff by failing to ensure its leased Saw was safe to use at the time of its delivery to Butler or otherwise warn him of the presence of the Spliced Cord because the cord was no longer rated to function in wet environments. The fact the Saw needs constantly spraying water means the Saw could not be used without some risk of electrical shock. Nor

19

did defendant warn either Butler of plaintiff of the dangerous condition. It did not provide Butler with a copy of the Saw's owner's manual or otherwise show him the Spliced Cord.

Missouri law is clear that establishing breach of duty does not require expert testimony "when the fact finder has been given enough information to be able to evaluate the facts of a case." *Parra*, 982 S.W.2d at 285 (cleaned up). Defendant is correct that Nevins provided no testimony that defendant breached a duty, *see* [Doc. 53-6 at 23], but there is still evidence for a jury to determine that, in line with *Parra*, defendant breached its duty. Nevins's testimony establishes that the Saw's power cord was defective and posed a risk of electrical shock when exposed to water. The uncontested facts establish that defendant leased the Saw in its unsafe condition. Based on these facts, a jury could decide that defendant breached its duty to plaintiff.

In sum, plaintiff shows that a dispute of material facts exists as to breach of duty and causation of injury, such that summary judgment cannot be granted as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion [Doc. 64] to strike defendant's Exhibit G [Doc. 53-7] is **DENIED**.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment [Doc. 52] is **DENIED**.

Dated this 18th day of May, 2023.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE